IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CHARLES LOTT, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 22-1292 |
| | § | |
| COUGAR DRILLING SOLUTIONS USA, INC., | § § | |
| | § | |
| Defendant. | § § | |

**MEMORANDUM AND ORDER**

Cougar Drilling Solutions USA, Inc. moves to dismiss Charles Lott's second amended complaint for failure to state a breach-of-contract claim. The background this case is set out more fully in the court's previous opinion. (*See* Docket Entry No. 26). In short, Lott contends that Cougar Drilling breached the parties' Asset Purchase Agreement when it failed to make conditional payments periodically from March 15, 2018 through March 15, 2020. (Docket Entry No. 28 ¶ 21).

**I.     The Legal Standard for a Motion to Dismiss**

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted lawfully." *Id*. (quoting *Twombly*, 550 U.S. at 556).

To withstand a Rule 12(b)(6) motion, a complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Lincoln v. Turner*, 874 F.3d 833, 839 (5th Cir. 2017) (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557). "A complaint 'does not need detailed factual allegations,' but the facts alleged 'must be enough to raise a right to relief above the speculative level.'" *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 765 (5th Cir. 2019) (quoting *Twombly*, 550 U.S. at 555). A court reviewing a motion to dismiss under Rule 12(b)(6) may consider "(1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Inclusive Cmtys Proj., Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019).

While a court should "freely give leave [to amend] when justice so requires," FED. R. CIV. P. 15(a)(2), futility of amendment is a proper basis to deny that leave. *Butler v. Porter*, 999 F.3d 287, 298 (5th Cir. 2021); *Foman v. Davis*, 371 U.S. 178, 182 (1962).

**II.    Analysis**

In 2015, Lott sold the assets of his business, Cobra Tool, to Cougar Drilling under the terms of an Asset Purchase Agreement. At that time, the parties also entered into an Employment Agreement, in which Cougar Drilling agreed to employ Lott as an at-will Project Manager. The Agreements provided that Lott was to receive "commission payments" in certain periods after Cougar Drilling collected at least $2.4 million in revenue from transactions involving certain assets

sold by Lott to Cougar Drilling under the Asset Purchase Agreement. These payments were to be made even if Lott was terminated by Cougar Drilling, which he was in April 2016.

Cougar Drilling argues that Lott's complaint should be dismissed because it fails to allege that any payment obligation arose during the period at issue. (Docket Entry No. 32 at 4).

The Employment Agreement defines the relevant terms:

> "Commission Period" means every one (1) month period commencing the first day of the month immediately following the month the Company's aggregate Revenues total reaches Two Million Four Hundred Thousand ($2,400,000.00) Dollars[.]
>
> "Revenues" means revenues (net of taxes) generated from the Whipstock Transactions that are actually collected and received by Company less any amounts owing to the Company by the Employee[.]
>
> "Whipstock Transactions" means transactions involving the tangible assets and intellectual property the Company and its affiliate acquired from Cobra Tool, Inc . . . which generate revenues from the sale of whipstocks and rental of whipstock assembly specific items . . . [but] do not include supervision charges . . . ; the rental of other Cougar Drilling Solutions downhole tools . . . ; or directional drilling services and other third party services."

(Docket Entry No. 28-1 at 31, § 1(a), (c) & (d)). "Commission Payments" are calculated as follows:

> From the date the Employee [that is, Lott] commences employment with the Company and for a period of five (5) years thereafter (the "Payment Term"), together with the next Salary Payment immediately after the end of such Commission Period, the Company shall pay the Employee twenty-five (25%) percent of the Revenues for such Commission Period (each a "Commission Payment"), if any, until the earlier of (i) the date the Employee has received Commission Payments that amount in aggregate to not more than Three Million ($3,000,000.00) Dollars (the "Maximum Payment"), and (ii) expiration of the Payment Term.

(*Id.* at 31, § 2(a)). If Cougar Drilling terminated Lott's employment for any reason, Lott was entitled to "Severance Payments," calculated in the same manner as the Commission Payments.

3

> If the Employee's employment with the Company is terminated for any reason whatsoever . . . prior to the Employee receiving the Maximum Payment, the Company shall make severance payments to the Employee at the times and in the manner the Employee would have paid Commission Payments but for termination of the Employee's employment with the Company[.]

(*Id.* at 31–32 § 2(b)).

Lott alleges that he was not paid any Commission Payment before his termination in April 2016. (Docket Entry No. 28 ¶ 13). He alleges that Cougar Drilling has never provided him with an accounting showing that the $2.4 million revenue target was not reached. (*Id.*). Lott "believes that Cougar likely exceeded the $2.4 million threshold at some point during the five-year period from March 15, 2015 through March 15, 2020," but, because he no accounting has been provided, he does not know when that threshold was reached. (*Id.* ¶ 14). Lott alleges that Cougar Drilling sold its assets to a "much larger foreign entity called TAQA during the relevant period," which "[n]o doubt . . . involved the intellectual property and assets Cougar had purchased from Cobra in March 2015." (*Id.*). Lott alleges that the Cougar Drilling-TAQA transaction "would have propelled Cougar well past the [$2.4 million] revenues hurdle." (*Id.*)

Lott asks the court to consider his declaration, submitted belatedly after the filing of the amended complaint. (Docket Entry No. 34). In his declaration, Lott states that "all completed sets of whipstocks" acquired from Cobra were sold by Cougar Drilling following the close of the Asset Purchase Agreement. (Docket Entry No. 34-1 ¶ 3). The amount of that sale was approximately $1 million, and about 40% of Cobra's remaining inventory acquired by Cougar Drilling remained after Cougar Drilling terminated Lott. (*Id.* ¶ 4). Lott states that he attempted to discover the status

4

of any Commission Payments due after he learned of the Cougar Drilling-TAQA transaction. (*Id.* ¶ 5). Cougar Drilling, in response, sent Lott a cease-and-desist letter. (*Id.* ¶ 6).

Cougar Drilling identifies four reasons for why, it believes, Lott's amended complaint should be dismissed:

> A. Lott admits that all of his allegations are speculation;
>
> B. Lott's allegations rely on a date range broader than the relevant period because he cannot in good faith plead that any relevant transaction actually occurred in the relevant period;
>
> C. The only transaction Lott specifically identifies is a corporate merger or sale, not a "Whipstock Transaction" that could satisfy any condition precedent; and
>
> D. Lott does not identify any Revenues collected after the time he alleges the $2.4 million threshold was met.

(Docket Entry No. 32 at 4).

In response, Lott argues that his allegations based on "information and belief" are not speculation but "reasonable hypothe[ses] based on known information." (Docket Entry No. 35 at 4). This known information includes the amount of qualifying revenue realized prior to Lott's termination, approximately $1 million; the fact that Cougar, at that time, held substantial inventory that remained to be sold and whose sale would result in qualifying revenue; and the fact that Cougar Drilling entered into a transaction in 2019 that would presumably allow it to sell to a wider market. (*Id.* at 6). Lott emphasizes that Cougar Drilling's revenue figures are within the exclusive control of Cougar Drilling, which has refused to grant Lott informal discovery with which to validate or defeat his claim. (*Id.* at 4 & n.1).

Lott's amended complaint does not state a claim. As Cougar Drilling notes, the complaint does not allege that the $2.4 million condition precedent was ever met, even if the court considers Lott's declaration in full. (Docket Entry No. 38 at 7–8). Lott's declaration states that Cougar

Drilling realized approximately $1 million in whipstock transactions, and that 40% of potential whipstock-transaction inventory remained after his termination. (Docket Entry No. 34-1 ¶ 4). If Cougar Drilling sold and realized similar revenues from that remaining inventory, those sales would have netted Cougar Drilling an additional $666,667 (rounded to the nearest dollar) of revenue,[1] for a total of $1,666,667—well under the $2.4 million threshold. Lott does not allege that Cougar Drilling created additional qualifying inventory.

The rest of Lott's arguments do not remedy the insufficiencies of the complaint. Lott alleges that Cougar Drilling never provided an accounting of whipstock transactions, but it appears that Cougar Drilling's response to Lott's request reflected only the uncontroversial proposition that communications to a represented party should be made to counsel. The communications Lott did receive indicated that no qualifying transactions were made between 2018 and the present. (Docket Entry No. 35 at 4–5 n.1). The mere fact of the Cougar Drilling-TAQA transaction is not relevant to determining whether Lott has successfully alleged that the $2.4 million threshold needed to trigger any Commission Payment was reached. He has not done so.

---

[1] Cougar Drilling sold 60% of the total allegedly qualifying inventory for $1 million, that is:
$$.6(\text{Total Possible Revenue from Inventory}) = \$1,000,000$$
Assuming the same revenues from the remaining 40% of the Cobra Tool inventory, the total revenue from the sale of qualifying inventory would be $1,000,000/.6, which is $1,666,667 (rounded to the nearest dollar).

## III.     Conclusion

Lott has had multiple opportunities to amend his complaint, which seeks to assert a straightforward breach-of-contract claim. The court finds that further amendment would be futile. The court grants Cougar Drilling's motion to dismiss, (Docket Entry No. 32), with prejudice. An order of dismissal will be separately entered.

SIGNED on December 14, 2022, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge